## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 0778 | DATE | July 28, 2003 |
| CASE TITLE | *Stryskowski v. Rush North Shore Medical Center* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, Defendant Rush North Shores Medical Center's Motion for Summary Judgment [10-1] is GRANTED.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

RTS — courtroom deputy's initials

date docketed: JUL 3 0 2003

Document Number: 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUL 3 0 2003

| | |
|---|---|
| JACOB STRYKOWSKI, | )<br>) |
| Plaintiff, | )<br>) Hon. Blanche M. Manning |
| v. | )<br>) Case No. 02 C 0778 |
| RUSH NORTH SHORE MEDICAL CENTER, | )<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Jacob Strykowski brought this action against Defendant Rush North Shore Medical Center ("RNS"), under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et. seq., alleging unlawful discharge (Count I) and retaliatory discharge (Count II). The instant matter comes before the Court on RNS's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is GRANTED.

# BACKGROUND[1]

## A. Strykowski's Work History with RNS

Strykowski, a respiratory therapist, was hired by RNS on August 30, 1993 and terminated on April 1, 2002. He worked the night shift along with one other employee, Ben Ramirez. His responsibilities included: (1) administering medication through aerosols, nebulizers, and incentive spirometers; (2) performing chest percussion; (3) drawing blood gas; (4) intubating patients; (5) setting up and maintaining ventilators; (6) performing CPR; and (7) responding to "codes" as part of the emergency response team when patients went into cardiac arrest.

The RNS job description for a respiratory therapist, which Strykowski signed and agreed to, requires that the employee have the ability "to lift, carry and push medium to heavy objects." Additionally, respiratory therapists are required to "stand" when performing chest percussions, during the initiation of nebulizer and aerosol treatments, and, when setting up ventilators. When responding to emergencies, eight to ten health care providers move quickly around the patient's bed trying to save his/her life. The scene is hectic and a respiratory therapist is standing or may be required to climb on the patient's bed to perform CPR. Respiratory therapists are also

---

[1] The facts in the Background section are derived from the parties' Local Rule 56.1 statements and other pleadings. The facts in Defendant's Local Rule 56.1(A)(3) statement that Plaintiff did not controvert in its Local Rule 56.1(b)(3)(A) statement are deemed admitted for purposes of this motion. Schulz v. Serfilco, Ltd., 965 F.2d 516, 519 (7th Cir. 1992). Likewise, the facts that Plaintiff provides in his Local Rule 56.1 statement and that Defendant did not controvert are also deemed admitted. Id. The facts that Plaintiff objected to but did not deny are deemed admitted. McGuire v. United Parcel Serv., 152 F.3d 673, 679 (7th Cir. 1998). Lastly, responses that did not cite to "specific references to the affidavits, parts of the record, and other supporting materials relied upon" as required under Local Rule 56.1(b)(3)(A) are subject to the court's discretion as to their admission. Brasic v. Heinemann's Inc., 121 F.3d 281, 284 (7th Cir. 1997).

required to move patients in different positions when performing treatments and responding to emergencies.

In August 2001, Strykowski learned that he needed to undergo back surgery due to a "non-occupational injury." To cover his absences, Strykowski arranged with his immediate supervisor to take 6-8 weeks of vacation, using his accumulated paid time off ("PTO"). Prior to his leave, Strykowski's work performance was satisfactory. His immediate supervisor had the authority to approve Strykowski's request as his role was to determine if "they could afford to let [the employee] be gone." Strykowski did not inform Human Resources that he was having surgery or taking an extended absence.

### B. Strykowski's Medical Condition

Strykowski had surgery on August 28, 2001, at Lutheran General Hospital. Unfortunately, there were unexpected complications following the surgery, and Strykowski suffered from "foot drop," lost feeling in both legs, which affected his balance and ability to walk. As a result, he was prone to fall if bumped and needed to hold something for balance when he walked. After using a walker for several months, he began using a cane around November 2001 to keep his balance. This condition continued through his termination on April 1, 2002.

Strykowski was not able to return to work after his six weeks of PTO elapsed. On October 16, 2001, after his PTO time had run out, he requested a formal medical leave of absence from Human Resources to begin on October 8, 2001 and to continue for six months (the maximum allowed under RNS's policy). Strykowski chose October 8, 2001, because his six weeks of PTO expired on that date. He intended to return to work prior to the expiration of the twelve weeks guaranteed under the FMLA. In support of his request, Strykowski submitted a

3

note from his physician, which stated that his medical condition began on August 28, 2001, its duration was "unknown at present" and that Strykowski "needs a walker for balance." Human Resources granted Strykowski's leave request and informed him that he was being placed on Family and Medical Leave effective October 8, 2001.

### C. Proposal to Return to Work

In the beginning of November 2001, Strykowski visited his immediate supervisor at the hospital to discuss his return to work. Although he no longer needed a walker and could use a cane to walk, Strykowski told his boss that he continued to have problems with his balance. They discussed Strykowski returning to work on a trial basis working in the pulmonary function lab. Strykowski claims that there were other jobs besides the pulmonary function lab such as oxygen rounds that he could perform, whereas RNS claims that he proposed working solely in the lab.

Although one of the duties of a respiratory therapist is to administer pulmonary function tests, Strykowski was not trained for and did not work in the pulmonary function lab because the lab is not open during the evenings, when he primarily worked. The pulmonary function tests are often performed in a dedicated pulmonary function lab although there is a portable bedside tester. The day shift respiratory therapists rotate through the pulmonary function lab. One day shift respiratory therapist, Fred Hotel, works in the lab more than others, but also performs the other duties of a respiratory therapist. For a few years in the early 1990s Hotel was the only respiratory therapist who worked in the pulmonary function lab but it was decided that others should be cross-trained and about 5 respiratory therapists now can work in the lab.

Strykowski intended to return part-time, working four hours a day. Strykowski and his immediate supervisor agreed that he would return to work on December 3, 2001. This

arrangement required Strykowski to be moved from night to day shift and to be trained to work in the pulmonary function lab in a newly created position dedicated to the pulmonary function lab.

On November 12, 2001, Strykowski wrote a letter to Dr. Bauer, his surgeon, describing his limitations and asking Dr. Bauer to prepare a letter reciting the same limitations. Strykowski claims the purpose of the letter was to obtain bus service to his home as he had difficulty climbing stairs. Dr. Bauer's letter recommended not undertaking any type of lifting or periods of prolonged standing.

In early December 2001, Strykowski's immediate supervisor spoke with Human Resources regarding Strykowski's reinstatement to the limited role in the pulmonary function lab. Strykoski's immediate supervisor was told of both RNS's policy distinguishing employees who required leave for occupational versus non-occupational injuries, as well as, the need to obtain a doctor's release for Strykowski stating that he could perform all functions of his job.

The parties dispute whether RNS maintains a practice of reinstating employees with "non-occupational injuries" who cannot perform all essential job functions. RNS contends that since June 17, 1996, it has maintained a policy whereby it will reinstate an employee with a work-related injury who cannot perform his normal duties to a temporary job consistent with his physical capabilities for no more than three months. The policy is called the Temporary Alternative Position Program ("TAP") and extends only to employees with "occupational injuries." RNS further claims that employees who have "non-occupational injuries" are not reinstated unless they can perform all essential functions of their job.

Strykowski alleges that RNS maintains a practice of reinstating employees with "non-occupational injuries" who cannot perform all of the essential job functions. For example, the

other employee with whom Strykowski worked the night shift suffered a "non-occupational injury" requiring amputation of his leg in July 1997, and was permitted to return to work in January 1998, on a part-time basis for the first two months, after receiving physical therapy. In addition, RNS allowed this employee to only work in the intensive care unit, so he would not have to walk around the entire hospital. RNS contends that this employee returned to work with full medical clearance and without restrictions, permitting him to resume all of his former duties.

On December 5, 2001, as per RNS's request, Strykowski's doctor signed a medical release but imposed a lifting restriction of ten pounds. There is dispute between the parties as to whether Strykowski's condition had improved from his discussion with his immediate supervisor a few weeks earlier and whether he was able to perform all duties of a respiratory therapist.

In December 2001, Human Resources decided against assigning Strykowski to a special, light duty position, in part because the work in the pulmonary function lab would not be steady. Shortly after December 5, 2001, Strykowski was informed that Human Resources would not allow him to return to work because of the lifting restriction. Earlier, when Strykowski's immediate supervisor had discussed reinstating Strykowski in a restricted, part-time position, the supervisor was unaware of RNS's policy distinguishing between "occupational" and "non-occupational injuries."

### D. Strykowski's Request for Disability Benefits

Strykowski applied for long term disability ("LTD") benefits under the RNS's long term disability plan. In allowing LTD benefits for Strykowski, the insurer had to determine that he was "disabled" which is defined under the plan as: "limited from performing the material and substantial duties of your regular occupation due to your sickness or injury" and "during the elimination period [first 90 days] you are unable to perform any of the material and substantial

duties of your regular occupation." This is a rigorous determination and benefits are only paid to employees who are truly disabled.

Additionally, Strykowski applied for social security disability benefits in September 2001. He was determined by the Social Security Administration to be disabled continuously since August 28, 2001, and he received his first payment in February 2002. Since January 2002, he has been receiving $1,892.22 per month in disability benefits in LTD insurance and social security. In order to receive these benefits, Strykowski claimed he was in fact disabled beginning August 28, 2001.

### E. Additional Leave Requested

On January 17, 2002, Strykowski submitted another leave request to Human Resources, asking for leave from January 1, 2002, through July 10, 2002. He stated that the reason for the request was, "I am disabled." In support of this request, his doctor stated that "patient cannot lift more than ten pounds." In response to this request, Strykowski received a letter from Human Resources stating that Strykowski had been given the maximum personal leave allowable under RNS policy (90 days) commencing on December 31, 2001, when his FMLA leave ended. It further stated that Strykowski could seek to return to work by March 31, 2002, (when his personal leave ended) if he was medically authorized to perform all essential functions of his job. If he did not return to work by then, he would be terminated on April 1, 2002, consistent with RNS's leave policy.

On or about April 4, 2002, Strykowski received another letter from RNS stating that his personal leave had expired and because he had not returned to work his employment was terminated on April 1, 2002. Strykowski did not respond to this letter and has not applied for employment at any other hospitals.

7

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir.1994). A genuine issue of material fact is one that might affect the outcome of the lawsuit, and factual disputes that are irrelevant will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of material fact exists, the court must construe the alleged facts in a light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Dale v. Chicago Tribune Co., 797 F.2d 458, 460 (7th Cir. 1986).

The moving party carries the initial burden of establishing that no genuine issue of material fact exists. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Becker v. Tenenbaum Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir.1990). The nonmoving party must do more than "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not merely rest upon the allegations or denials in its pleading, but instead, must "set forth specific facts showing that there is a genuine issue for trial." See Anderson, 477 U.S. at 248. If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted. Id. at 250-51 (citations omitted). The court considers the record as a whole, and draws all reasonable inferences in the

light most favorable to the nonmoving party. Regner v. City of Chicago, 789 F.2d 534, 536 (7th Cir.1986).

Courts are cautious in granting summary judgment in employment discrimination cases because often issues of intent and credibility are involved. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.1993); McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 370-71 (7th Cir.1992). Summary judgment is inappropriate if the court must balance conflicting indications of motive and intent. Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 97 (7th Cir.1985). An employer can only prevail at the summary judgment stage if the record shows that a reasonable trier of fact must conclude that the employment decision was not based on discrimination. Veprinsky v. Daniel, Inc., 87 F.3d 881, 893-94 (7th Cir.1996).

## ANALYSIS

Strykowski alleges that RNS violated his rights under the FMLA, when it: (1) refused to reinstate him to his former position or an equivalent position after 12 weeks of unpaid leave; and (2) terminated him in retaliation for taking his FMLA leave. RNS has moved for summary judgment on the grounds that it: (I) lawfully discharged Strykowski because he was unable to perform all essential job functions of a respiratory therapist; and (II) lawfully terminated him only after he had exhausted all FMLA time and personal leave time and not because he exercised his FMLA rights. The Court will discuss each of these contentions in turn.

### I. Discharge Under FMLA

The parties dispute regarding Strykowski's discharge under the FMLA centers on: (A) when the FMLA 12 week period began and ended; and (B) whether Strykowski was able to perform his essential job functions at the end of that period. Strykowski contends that the 12 week statutory period began on October 8, 2001 and ended on December 31, 2001, as per his

9

request and his correspondence with RNS. RNS contends that under a recent Supreme Court ruling, the 12 week period began on August 28, 2001, and ended on November 19, 2001.

### A. FMLA's 12 Week Period

The FMLA guarantees qualified employees 12 weeks of unpaid leave each year following certain events: a disabling health problem, a family member's serious illness, or the arrival of a new son or daughter. 29 U.S.C. § 2612(a)(1). FMLA permits employers to require employees to substitute any accrued paid vacation leave for FMLA leave. 29 U.S.C. § 2612(d)(2)(A). The question in the instant case is whether the affirmative representation by an RNS employee to Strykowski that his 12 weeks would begin on October 8, 2001, and end on December 31, 2001, delays the start of the 12 week period under the FMLA.

To answer this question, the Court turns to Ragsdale v. Wolverine, 535 U.S. 81 (2002). In Ragsdale, the Supreme Court invalidated regulation 29 C.F.R. § 825.700(a), which required an employer to notify the employee of the FMLA designation in order for it to count against the FMLA 12 week entitlement. Id. at 88. In declaring the regulation in contravention of the FMLA, the Supreme Court stressed the fact that the 12 week period was both a minimum and maximum. Id. The Secretary of Labor lacked the authority to contravene congressional intent and create a windfall for an employee whose employer did not immediately designate the leave as FMLA 12 week leave. Id. at 91. Examining the legislative history of the FMLA, the Supreme Court instead determined that a better approach to resolving any notice violations would be to determine whether there was actually any harm suffered by the employee or prejudice because of the failure to sooner designate the leave under FMLA. Id. at 88.

The underpinnings of Ragsdale are insightful and useful in deciding the issue before the Court today. The purpose of the FMLA was to allow an employee to leave work for 12 weeks

10

for a family or personal medical situation without fear of losing one's job. The extension Strykowski asks for today would both undermine and contravene these purposes by allowing him to leave work for medical reasons for nearly 28 weeks and still be afforded protection under FMLA as if he had only taken the 12 week statutory required period. As Sewall v. CTA, No. 99 C 8372, 2001 WL 40802, at *6 (N.D. Ill. Jan. 16, 2001), points out, "an employer may place an employee on FMLA leave 'involuntarily,' that is, even if the employee does not request such a leave, as long as the employee is 'eligible' for leave and then takes a qualified absence from work." The Seawall court looked to the date upon which the condition began that made the employee unfit to work and calculated the 12 weeks from that date forward. Id. Here, Strykowski was unable to work starting on August 28, 2001, due to complications from his surgery which constituted a disabling health problem.

Relying on Ragsdale, the Court in Farina v. Compuware Corporation, No. CV-98-722-PHX-ROS, 2003 WL 1846857, at *14 (DC Az. Mar. 31, 2003), held that it was immaterial that an employer made an affirmative misrepresentation of when the employee's FMLA leave began because, the "plaintiff still bears the burden, under Ragsdale, of showing some prejudicial impairment of rights under the FMLA from the affirmative representation." Id. at *19.

Here, on either date when the 12 week period expired, it is undisputed that Strykowski was unable to return to work. Therefore, any representations from RNS did not result in detrimental reliance or prejudice because Strykowski was unable to return to work and did not attempt to return to work until December 3, 2001. As Ragsdale noted, "the judge or jury must ask what steps the employee would have taken had circumstances been different." Ragsdale 53 U.S. at 88. Here, is clear to the Court that Strykowski would not have taken different steps if he had known that his FMLA leave began to run on August 28, 2001.

11

## B. Essential Function of Job

RNS also contends that Strykowski was not entitled to reinstatement because he was unable to perform his essential job functions at the end of the statutory 12 week period. The regulations promulgated under the FMLA state that "if the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA." 29 C.F.R. § 825.214(b). In Madison v. Sherwin Williams Co., 158 F. Supp. 2d 853, 859 (N.D. Ill. Apr. 6, 2001), the court held that an employee had no right under the FMLA to be restored to her former position because she could not perform an essential function of her job. The Court reasoned that "[the employee] was physically unable to perform the duties [of her former job] . . . [a]ccordingly, [she] has no rights to be restored to [her position] . . . under the FMLA." Id. Likewise, in Tardie v. Rehabilitation Hospital of Rhode Island, 168 F.3d 538, 544 (1st Cir. 1999), the court found that "[u]nlike the ADA the FMLA regulation [Section 825.214(b)] omits the qualifying 'with or without reasonable accommodation' language." See also Alifiano v. Merck & Co., 175 F. Supp. 2d 792, 795 (E.D. Pa. Dec. 7, 2001) (court dismissed employee's unlawful termination action under the FMLA because she was unable to return to work and perform her job and "the FMLA does not require an employer to reasonably accommodate an employee's serious health condition").

Here, the evidence shows that Strykowski was unable to perform the duties of a respiratory therapist at the time of his termination.[2] His responsibilities prior to his leave

---

[2] Stryskowski contends that his boss made arrangements for him to resume working for RNS at a newly created, light duty position. As a matter of law, however, under the FMLA, RNS was not required to restructure or accomodate Strykowski.

included: (1) administering medication through aerosols, nebulizers, and incentive spirometers; (2) performing chest percussion; (3) drawing blood gas; (4) intubating patients; (5) setting up and maintaining ventilators; (6) performing CPR; and (7) responding to "codes" as part of the emergency response team when patients went into cardiac arrest. Additionally, the RNS job description for a respiratory therapist, which Strykowski signed and agreed to, requires that the employee have the ability "to lift, carry and push medium to heavy objects." Respiratory therapists are also required to "stand" when performing chest percussions, during the initiation of nebulizer and aerosol treatments, and, when setting up ventilators. When responding to emergencies, eight to ten health care providers move quickly around the patient's bed trying to save his/her life. The scene is hectic and a respiratory therapist is standing or may be required to climb on the patient's bed to perform CPR. Respiratory therapists are also required to move patients in different positions when performing treatments and responding to emergencies.

Strykowski's doctor stated that Strykowski could not lift more than 10 lbs or stand for a prolonged period of time. Furthermore, Strykowski has been collecting social security disability since February, 2002 and was found to be disabled since August 28, 2001. Consequently, the Court holds that Strykowski was unable to perform essential job functions when his FMLA 12-week leave expired, and was therefore lawfully discharged.

## II.     Retaliatory Discharge

RNS has also moved for summary judgment on Count II (retaliatory discharge) because it contends that Strykowski was lawfully discharged after his leave expired because he was unable to return to work. Strykowski alleges that RNS violated his FMLA rights by terminating him in retaliation for exercising those rights. Intent is central to a charge of retaliatory discharge and in the absence of direct evidence of intent, the Seventh Circuit uses the familiar burden-

13

shifting framework established by the Supreme Court in McDonnell Douglass Corp. v. Green, 411 U.S. 792, 973. See King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999) (FMLA case using the McDonnell-Douglas burden shifting test). To establish a prima facie case of retaliatory discharge, a plaintiff must establish: (1) the plaintiff engaged in the protected activity; (2) the employer took adverse employment action against the employee; and (3) a casual connection exists between the employee's protected activity and the employer's adverse employment action. Id. at 892. See also Sewall v. CTA, No. 99 C 8372, 2001 WL 40802, at *8 (N.D. Ill. Jan. 16, 2001) (FMLA case applying McDonnell-Douglas burden shifting test to show retaliatory discharge). Upon the establishment of a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for termination. Id. Once the employer gives its reason the plaintiff then has the opportunity to demonstrate that "the proffered reason was not the true reason for the employment decision," and that the employee's exercise of his protected rights was in fact the true reason for the termination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

To show pretext, the plaintiff must put forth significantly probative admissible evidence showing that the employer's articulated reason for the discharge was pretext for discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). The Supreme Court described pretext as, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." Id. (emphasis in the original). See also King, 166 F.3d at 893; McClendon v. Indian Sugars, Inc., 108 F.3d 789, 797 (7th Cir. 1997) ("Once the employer makes this showing, the burden then shifts back to the employee to show that the employer's proffered reasons are pretextual and that its actual reason was discriminatory or retaliatory").

Here, as detailed above, RNS has shown that it terminated Strykowski because after his leave time expired he was unable to perform the essential functions of his job, not because he availed himself of FMLA leave. In response, Strykowski contends that his co-worker was permitted to return to work with limitations after an extended absence from work due to a "non-occupational injury." Strykowski asserts that the co-worker was allowed to return because he, unlike Strykoski, did not request formal FMLA leave. The other employee, however, unlike Strykowski, had enough PTO to cover the duration of his absence and obtained a full medical release at the expiration of his leave. Consequently, RNS is entitled to summary judgment on the retaliatory termination claim.

## CONCLUSION

For the foregoing reasons, Defendant Rush North Shores Medical Center's Motion for Summary Judgment [10-1] is GRANTED.

ENTER:

BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE: 7-08-03